## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

JOSHUA GARCIA, ANDREA P. BRANDT )
and HOWARD HART, individually and on )
behalf of all others similarly situated, )
                               )
                  Plaintiffs, )    **CIVIL ACTION NO.:**
                               )
        v. )
                               )
ALTICOR, INC., THE BOARD OF )    **CLASS ACTION COMPLAINT**
DIRECTORS OF ALTICOR, INC., THE )
FIDUCIARY COMMITTEE OF ALTICOR, )
INC., and JOHN DOES 1-30. )
                               )
              Defendants. )

## COMPLAINT

Plaintiffs, Joshua Garcia, Andrea P. Brandt and Howard Hart ("Plaintiffs"), by and through their attorneys, on behalf of the Amway Retirement Savings Plan (the "Plan"),[1] themselves and all others similarly situated, state and allege as follows:

### I.     INTRODUCTION

1.     This is a class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Alticor Inc. ("Amway" or "Company") and the Board of Directors of Alticor Inc. and its members during the Class Period[2] ("Board") and the Fiduciary Committee of Alticor Inc. and its members during the Class Period ("Committee") for breaches of their fiduciary duties.

---

[1] The Plan is a legal entity that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plan is not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plan and its participants.

[2] The Class Period, as will be discussed in more detail below, is defined as November 9, 2014 through the date of judgment.

2.      To safeguard Plan participants and beneficiaries, ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries.  Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These twin fiduciary duties are "the highest known to the law." *Griffin v. Flagstar Bancorp, Inc.*, 492 F. App'x 598, 603 (6th Cir. 2012).

3.      The Department of Labor has explicitly stated that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices."  *See, "A Look at 401(k) Plan Fees," supra*, at n.3; *see also Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1823 (2015) (*Tibble I*) (reaffirming the ongoing fiduciary duty to monitor a plan's investment options).

4.      Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must give substantial consideration to the cost of investment options.  "Wasting beneficiaries' money is imprudent.  In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs."  Uniform Prudent Investor Act (the "UPIA"), § 7.

5.      "The Restatement … instructs that 'cost-conscious management is fundamental to prudence in the investment function,' and should be applied 'not only in making investments but also in monitoring and reviewing investments.'"  *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197-98 (9th Cir. 2016) (*en banc*) (quoting Restatement (Third) of Trusts, § 90, cmt. b) ("*Tibble II*").[3]

---

[3] *See also* U.S. Dep't of Labor, *A Look at 401(k) Plan Fees*, (Aug. 2013), at 2, available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited February 21, 2020) ("You should be aware that your employer also has a specific obligation to consider the fees and expenses paid by your plan.").

6.     Additional fees of only 0.18% or 0.4% can have a large effect on a participant's investment results over time because "[b]eneficiaries subject to higher fees … lose not only money spent on higher fees, but also lost investment opportunity; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

7.      Most participants in 401(k) plans expect that their 401(k) accounts will be their principal source of income after retirement.  Although at all times 401(k) accounts are fully funded, that does not prevent plan participants from losing money on poor investment choices by plan sponsors and fiduciaries, whether due to poor performance, high fees or both.

8.     Prudent and impartial plan sponsors thus should be monitoring both the performance and cost of the investments selected for their 401(k) plans, as well as investigating alternatives in the marketplace to ensure that well-performing, low cost investment options are being made available to plan participants.

9.     At all times during the Class Period (November 9, 2014 through the date of judgment) the Plan had at least 1.1 billion dollars in assets under management.  At the end of 2017 and 2018, the Plan had over 1.2 billion dollars and 1.1 billion dollars, respectively, in assets under management that were/are entrusted to the care of the Plan's fiduciaries.

10.     The Plan's assets under management qualifies it as a jumbo plan in the defined contribution plan marketplace, and among the largest plans in the United States.  As a jumbo plan, the Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments.  Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

11.     Plaintiffs allege that during the putative Class Period Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiffs, and to the other participants of the Plan by, *inter alia*, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plan's recordkeeping costs.

12.      Defendants' mismanagement of the Plan, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duties of prudence and loyalty, in violation of 29 U.S.C. § 1104.  Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

13.     Based on this conduct, Plaintiffs assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence (Count One) and failure to monitor fiduciaries (Count Two).

## II.       JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

15.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

16.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all of the violations of ERISA occurred in this District and

Defendants reside and may be found in this District.  Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

### III.     PARTIES

**Plaintiffs**

17.     Plaintiff, Joshua Garcia ("Garcia"), resides in Walker, Michigan. During his employment, Plaintiff Garcia participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

18.     Plaintiff, Andrea P. Brandt ("Brandt"), resides in Grand Rapids, Michigan. During her employment, Plaintiff Brandt participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

19.     Plaintiff, Howard Hart ("Hart"), resides in Hawthorne, California. During his employment, Plaintiff Hart participated in the Plan investing in the options offered by the Plan and which are the subject of this lawsuit.

20.     Each Plaintiff has standing to bring this action on behalf of the Plan because each of them participated in the Plan and were injured by Defendants' unlawful conduct.  Plaintiffs are entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

21.     Plaintiffs did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and

pricing of collective trusts) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

### Defendants

#### Company Defendant

22.     Alticor Inc., which is the corporate parent of Amway, is the Plan sponsor and a named fiduciary with a principal place of business being 7575 E. Fulton Street, 56-3T, Kent County, Ada, Michigan 49355.  The December 31, 2018 Form 5500 filed with the United States Department of Labor ("2018 Form 5500") at 1.

23.     Amway was founded in "1959 by Rich DeVos and Jay Van Andel and revolutionized the business model known as direct selling.[4]" Amway describes itself as a disruptor in the "the retail industry by empowering Amway Business owners to be leaders in social commerce." *Id.* Amway's business model "stretches across six continents with a presence in more than 100+ countries and territories." *Id.* As of 2020, Amway had "[m]ore than one million Amway Business Owners (ABOs) … ." *Id.* These Amway Business Owners or ABOs are "supported by more than 15,000 employees who work in hundreds of locations around the world." *Id.*

24.     The Company, acting through its Board of Directors, appointed the Committee which "is responsible for oversight of the Plan, determines the appropriateness of the Plan's investment strategy, and monitors investment performance." *See*, the December 31, 2018 Auditor Report of the Amway Retirement Savings Plan ("2018 Auditor Report") at 7.

25.     Accordingly, the Company had a concomitant fiduciary duty to monitor and supervise those appointees.

---

[4] https://www.amwayglobal.com/our-story/ last accessed on October 15, 2020.

26.    Amway also made discretionary decisions to make profit sharing and employer matching contributions to the Plan each year. As detailed in the Plan Document: "[t]he Employer shall determine the amount of the following discretionary contributions for each Plan Year: … Profit Sharing Contribution … Matching Contribution … ." The Amway Retirement Savings Plan as Amended and Restated on January 1, 2016 ("Plan Doc.") at 13.

27.    Accordingly, Amway during the putative Class Period is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over management or disposition of Plan assets and because it exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

28.    For the foregoing reasons, the Company is a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

**Board Defendants**

29.    As detailed above, the Company, acting through its Board of Directors, appointed the Committee which is purportedly "responsible for oversight of the Plan, determines the appropriateness of the Plan's investment strategy, and monitors investment performance." 2018 Auditor Report at 7. As will be discussed below, the Committee failed to carry out its fiduciary duties prudently. Accordingly, the Board had a concomitant fiduciary duty to monitor and supervise those appointees. Further, the Plan Doc. states that: "[a]n action required to be taken by the Employer shall be taken by its board of directors or by an officer authorized to act on behalf of the Employer." Plan Doc. at 62.

30.    Under ERISA, fiduciaries with the power to appoint have the concomitant fiduciary duty to monitor and supervise their appointees.

31.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1-10) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets and because each exercised discretionary authority to appoint and/or monitor the other fiduciaries, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

32.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1-10), are collectively referred to herein as the "Board Defendants."

### Committee Defendants

33.      As discussed above, the Committee "is responsible for oversight of the Plan, determines the appropriateness of the Plan's investment strategy, and monitors investment performance" 2018 Auditor Report at 7.

34.      As described in the Trust Agreement, the Committee, acting through the authority delegated to it by the Company, is/was all times is supposedly responsible for "all decisions concerning the plan's investment line-up or its investment strategies … ." Trust Agreement between Alticor Inc. and Fidelity Management Trust Company ("Trust Agreement") at 6. As will be discussed in more detail below, the Committee failed to prudently carry out these fiduciary responsibilities.

35.     The Investment Committee and each of its members were fiduciaries of the Plan during the Class Period, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

36.     The Committee and unnamed members of the Committee during the Class Period (referred to herein as John Does 11-20), are collectively referred to herein as the "Committee Defendants."

**Additional John Doe Defendants**

37.     To the extent that there are additional officers, employees and/are contractors of Amway who are/were fiduciaries of the Plan during the Class Period, or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiffs, Plaintiffs reserve the right, once their identities are ascertained, to seek leave to join them to the instant action.  Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, Amway officers, employees and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## IV.     CLASS ACTION ALLEGATIONS

38.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and the following proposed class ("Class"):[5]

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between November 9, 2014 through the date of judgment (the "Class Period").

39.     The members of the Class are so numerous that joinder of all members is impractical.  The 2018 Form 5500 lists 5,281 Plan "participants with account balances as of the end of the plan year."  2018 Form 5500 at 2.

40.     Plaintiffs' claims are typical of the claims of the members of the Class.  Like other Class members, Plaintiffs participated in the Plan and have suffered injuries as a result of

---

[5] Plaintiffs reserve the right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

Defendants' mismanagement of the Plan. Defendants treated Plaintiffs consistently with other Class members and managed the Plan as a single entity. Plaintiffs' claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

41.     There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members.  Common legal and factual questions include, but are not limited to:

A.     Whether Defendants are/were fiduciaries of the Plan;

B.     Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.     Whether the Defendants responsible for appointing other fiduciaries failed to adequately monitor their appointees to ensure the Plan was being managed in compliance with ERISA;

D.     The proper form of equitable and injunctive relief; and

E.     The proper measure of monetary relief.

42.     Plaintiffs will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA class action litigation.  Plaintiffs have no interests antagonistic to those of other members of the Class.  Plaintiffs are committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

43.     This action may be properly certified under Rule 23(b)(1).  Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for

Defendants.  Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

44. In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## V.    THE PLAN

45. Amway "originally established the Amway Corporation Salaried Employees' Profit-Sharing Plan, effective August 31, 1965, and amended the plan from time to time." Plan Doc. at Appendix B. The Plan underwent several amendments since its founding in 1965. Most notable was the 2003 Amendment which recognized the name change of the Amway Corporation to Alticor Inc. *Id.* In 2008, the Plan took on its current name being the Amway Retirement Saving Plan. *Id.* The Plan covers the "eligible employees of Alticor Inc. (the Plan's sponsor) and the following subsidiaries: Merchandising Productions, Inc.; Trout Lake Farm, LLC; Amway Corp.; Amway International, Inc.; Access Business Group, LLC; Access Business Group International, LLC; Pyxis Innovations, Inc.; Access Logistics, LLP; ABGI Corp.; Amway Management Services, Inc.; and Amway Global Services, Inc. (collectively, the Company)." 2018 Auditor Report at 6.

46. The Plan is a "defined contribution" or "individual account" plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plan provides for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts,

and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Plan Doc. at 23.  Consequently, retirement benefits provided by the Plan are based solely on the amounts allocated to each individual's account.  *Id.*

### *Eligibility*

47.     In general, regular full-time employees are eligible to participate in the Plan.  2018 Auditor Report at 6. The 2018 Auditor Report states: "Eligible employees become participants in the Plan upon employment and attainment of age 18." *Id.* "[E]mployees are automatically enrolled in the Plan at a rate of 6 percent of eligible compensation, unless they elect otherwise." *Id.*

### *Contributions*

48.     There are several types of contributions that can be added to a participant's account, including: an employee salary deferral contribution, an employee Roth 401(k) contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary profit sharing contributions and employer matching contributions based on employee pre-tax, Roth 401(k), and employee after-tax contributions.  *Id.*

49.     With regard to employee contributions: "[a] participant may elect to make contributions to the Plan through payroll deductions of 1-70 percent of the participant's compensation" 2018 5500 at 6. As discussed above, Amway may decide to make matching contributions to the Plan in any given year. *Id.* As described in the 2018 Auditor Report: "[d]uring the years ended December 31, 2018 and 2017, the matching contribution was 50 percent of the participant's contribution up to 6 percent of compensation deferred." *Id.*

50.     Like other companies that sponsor 401(k) plans for their employees, Amway enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 401(k) plans at

the time when the contributions are made. *See generally,* https://www.irs.gov/retirement-plans/plan-sponsor/401k-plan-overview.

51.     Amway also benefits in other ways from the Plan's matching program.  It is well-known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See,* https://www.paychex.com/articles/employee-benefits/employer-matching-401k-benefits.

52.     Given the size of the Plan, Amway likely enjoyed a significant tax and cost savings from offering a match.

### *Vesting*

53.     With regard to contributions made by participants to the Plan, "[p]articipants are immediately vested in their voluntary contributions plus actual earnings thereon." 2018 Auditor Report at 7. Matching contributions made by Amway are subject to a five year vesting schedule based on years of continuous service. *Id.* That is, participants are fully vested in Amway's matching contributions by their fifth year of service with Amway. *Id.*

### *The Plan's Investments*

54.     In theory, the Committee responsibilities include "oversight of the Plan, determin[ing] the appropriateness of the Plan's investment strategy, and monitor[ing] investment performance" 2018 Auditor Report at 7. As described in the Plan Document, the Committee must carry out these responsibilities with "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent Person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims … ." Plan Doc. at 67. The Committee must also act "[f]or the exclusive purpose of providing benefits and paying expenses of administration … ." *Id.*  But in practice, as alleged below, that is not what happened.

55.     Several funds were available to Plan participants for investment each year during the putative Class Period.  Specifically, a participant may direct all contributions to selected investments as made available and determined by the Committee. Trust Agreement at 6. As described in the Trust Agreement, the Committee has the authority to make: "all decisions concerning the plan's investment line-up or its investment strategies … ." *Id.*

56.     The Plan's assets under management for all funds as of December 31, 2018 was $1,194,312,657.  2018 Auditor Report at 4.

### Payment of Plan Expenses

57.     During the Class Period, administrative expenses were paid for using Plan assets. As described in the Plan Document: "[r]evenue generated by the investment of plan assets … may be allocated as the Administrator determines, in its sole discretion, … to pay or offset administrative expenses incurred in the operation and administration of this plan" Plan Doc. at 30.

## VI.     THE PLAN'S FEES DURING THE CLASS PERIOD WERE UNREASONABLE

### A. The Totality of Circumstances Demonstrate that the Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner

58.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

59.     ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted).  In addition to a duty to select prudent investments, under ERISA a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the [fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 135 S. Ct. at 1828.

60.     Plaintiffs did not have and do not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes

(and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery.  *See Braden v. Wal-mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.")

61.     For purposes of this Complaint, Plaintiffs have drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

62.     Defendants' breaches of their fiduciary duties, relating to their overall decision-making, resulted in  *inter alia*, the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

### (1) Defendants Failed to Adequately Monitor the Plan's Recordkeeping Expenses

63.     The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper."   Recordkeeping expenses can either be paid directly from plan assets, or indirectly by the plan's investments in a practice known as revenue sharing (or a combination of both or by a plan sponsor).   Revenue sharing payments are payments made by investments within the plan, typically mutual funds, to the plan's recordkeeper or to the plan directly, to compensate for recordkeeping and trustee services that the mutual fund company otherwise would have to provide.

64.     Although utilizing a revenue sharing approach is not per se imprudent, unchecked, it is devastating for Plan participants (e.g., see allegations supra).   "At worst, revenue sharing is a way to hide fees.   Nobody sees the money change hands, and very few understand what the total investment expense pays for.   It's a way to milk large sums of money out of large plans by charging a percentage-based fee that never goes down (when plans are ignored or taken advantage of).   In

some cases, employers and employees believe the plan is 'free' when it is in fact expensive." Justin Pritchard, "Revenue Sharing and Invisible Fees" available at http://www.cccandc.com/p/revenue-sharing-and-invisible-fees (last visited March 19, 2020).

65. In this matter, using revenue sharing to pay for recordkeeping resulted in a worst-case scenario for the Plan's participants because it saddled Plan participants with above-market recordkeeping fees.

66. As demonstrated in the chart below, the Plan's per participant administrative and recordkeeping fees were astronomical when benchmarked against similar plans.

|  | Participants | Hard Dollar Payments - Fidelity | Indirect Payments - Fidelity | Total Comp to Fidelity | Per Participant Cost |
|---|---|---|---|---|---|
| 2018 | 5,281 | $457,002 | $703,410 | $1,160,412 | $219.73 |
| 2017 | 5,318 | $404,870 | $1,302,536 | $1,707,406 | $321.06 |
| 2016 | 5,466 | $436,297 | $1,395,293 | $1,831,590 | $335.09 |
| 2015 | 5,564 | $205,610 | $1,021,477 | $1,227,087 | $220.54 |
| 2014 | 5,780 | $52,857 | $1,112,014 | $1,164,871 | $201.53 |

67. By way of comparison, we can look at what other plans are paying for recordkeeping and administrative costs.

68. One data source, the *401k Averages Book* (20th ed. 2020)[6] studies plan fees for much smaller plans, those under $200 million in assets. Although it studies much smaller plans than the Plan, it is nonetheless a useful resource because we can extrapolate from the data what a slightly bigger plan like the Plan should be paying for recordkeeping. That is because recordkeeping and administrative fees should *decrease* as a plan increases in size. For example, a plan with 200 participants and $20 million in assets has an average recordkeeping and

---

[6] "Published since 1995, the *401k Averages Book* is the oldest, most recognized source for non-biased, comparative 401(k) average cost information." *401k Averages Book* at p. 2.

administration cost (through direct compensation) of $12 per participant.  *401k Averages Book* at

p. 95.  A plan with 2,000 participants and $200 million in assets has an average recordkeeping and

administration cost (through direct compensation) of $5 per participant.  *Id.*, at p. 108.  Thus, the

Plan, with over $1 billion dollars in assets in 2018 and over 5,000 participants in 2018, should

have had direct recordkeeping costs below the $5 average, which it clearly did not.

69.     The Plan's total recordkeeping costs are clearly unreasonable as some authorities

have recognized that reasonable rates for large plans typically average around $35 per participant,

with costs coming down every day.[7]

70.     In order to make an informed evaluation as to whether a recordkeeper or other

service provider is receiving no more than a reasonable fee for the services provided to a plan, a

prudent fiduciary must identify all fees, including direct compensation and revenue sharing being

paid to the plan's recordkeeper.  To the extent that a plan's investments pay asset-based revenue

sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that

the recordkeeper's total compensation from all sources does not exceed reasonable levels, and

require that any revenue sharing payments that exceed a reasonable level be returned to the plan

and its participants.

71.     Further, a plan's fiduciaries must remain informed about overall trends in the

marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that

are available.  This will generally include conducting a Request for Proposal ("RFP") process at

---

[7] Case law is in accord that large plans can bargain for low recordkeeping fees.  *See*, *e.g.*, *Spano v. Boeing*, Case 06-743, Doc. 466, at 26 (S.D. Ill. Dec. 30, 2014) (plaintiffs' expert opined market rate of $37–$42, supported by defendants' consultant's stated market rate of $30.42–$45.42 and defendant obtaining fees of $32 after the class period); *Spano*, Doc. 562-2 (Jan 29, 2016) (declaration that Boeing's 401(k) plan recordkeeping fees have been $18 per participant for the past two years); *George*, 641 F.3d at 798 (plaintiffs' expert opined market rate of $20–$27 and plan paid record-keeper $43–$65); *Gordon v. Mass Mutual*, Case 13-30184, Doc. 107-2 at ¶10.4 (D.Mass. June 15, 2016) (401(k) fee settlement committing the Plan to pay not more than $35 per participant for recordkeeping).

reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace.  More specifically, an RFP should happen at least every three to five years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans. *George v. Kraft Foods Glob., Inc.*, 641 F.3d 786, 800 (7th Cir. 2011); *Kruger v. Novant Health, Inc.*, 131 F. Supp. 3d 470, 479 (M.D.N.C. 2015); *see also* NEPC 2019 Defined Contribution Progress Report at 10 ("Best Practice is to compare fees and services through a record keeping vendor search Request for Proposal process).

72.     The fact that the Plan has stayed with the same recordkeeper over the course of the Class Period, and paid the same relative amount in recordkeeping fees, there is little to suggest that Defendants conducted a RFP at reasonable intervals – or certainly at any time prior to 2014 through the present - to determine whether the Plan could obtain better recordkeeping and administrative fee pricing from other service providers given that the market for recordkeeping is highly competitive, with many vendors equally capable of providing a high-level service.

73.     It appears that as of May 2020 – well into the Class Period – the Plan obtained an annual administration Fee for Core Services charge of $53 per participant.  To the extent this charge included fees for recordkeeping services it is still above market rates for a billion dollar plan as alleged above.

74.     Given the size of the Plan's assets during the Class Period and total number of participants, in addition to the general trend towards lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeeper at a lower cost.

    **(2) Many of the Plan's Funds Had Investment Management Fees In Excess of Fees for Funds in Similarly-Sized Plans**

75.     Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (conservatively, plans having above 1 billion dollars in assets).

76.     In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider" to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation." [8]

77.     The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether or not to enter into or extend such contract or arrangement.

78.     As stated by the DOL: ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers."  DOL 408(b)(2) Regulation Fact Sheet.

---

[8] *See https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf* ("DOL 408(b)(2) Regulation Fact Sheet")

79.     Investment options have a fee for investment management and other services.  With regard to investments like mutual funds, like any other investor, retirement plan participants pay for these costs via the fund's expense ratio evidenced by a percentage of assets.  For example, an expense ratio of .75% means that the plan participant will pay $7.50 annually for every $1,000 in assets.  However, the expense ratio also reduces the participant's return and the compounding effect of that return.  This is why it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

80.      "The duty to pay only reasonable fees for plan services and to act solely in the best interest of participants has been a key tenet of ERISA since its passage."  "Best Practices for Plan Fiduciaries," at 36, published by Vanguard, 2019.[9]

81.     For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (_i.e._, fees charged by other comparable investment funds to similarly situated plans).  This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant.  However, for comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power.  Large plans for instance are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

82.     According to Vanguard, "[b]enchmarking is one of the most widely used supplements to fee disclosure reports and can help plan sponsors put into context the information contained in the reports."  "Best Practices for Plan Fiduciaries," at 37.

83.     "The use of third-party studies provides a cost-effective way to compare plan fees with the marketplace. Plan sponsors may elect to engage a consultant to assist in the benchmarking process.  For a fee, consultants can give plan sponsors a third-party perspective on quality and

---

[9] Available at https://institutional.vanguard.com/iam/pdf/FBPBK.pdf?cbdForceDomain=false.

costs of services.  It is important to understand the plan (*e.g.,* plan design, active or passive investment management, payroll complexities, etc.) as it relates to the benchmarking information in order to put the results in an appropriate context.  By understanding all of the fees and services, a plan sponsor can make an accurate 'apples-to-apples' comparison." *Id.*

84.    Here, the Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

85.    In some cases, expense ratios for the Plan's funds were ***246%*** above the ICI Median (in the case of Baron Growth Instl.) and ***243%*** above the ICI Median (in the case of Hotchkis & Wiley Mid-Cap Value I) in the same category.  The high cost of the Plan's funds is also evident when comparing the Plan's funds to the average fees of funds in similarly-sized plans. These excessively high expense ratios are detailed in the chart below:

| Current Fund | ER | Category | ICI Median |
|---|---|---|---|
| T. Rowe Price Blue Chip Growth I | 0.56 % | Domestic Equity | 0.30% |
| Baron Growth Instl. | 1.04 % | Domestic Equity | 0.30% |
| Neuberger Berman Genesis R6 | 0.75 % | Domestic Equity | 0.30% |
| Fidelity Treasury Only Money Market | 0.42 % | Money Market | 0.11% |
| Hotchkis & Wiley Mid-Cap Value I | 1.03 % | Domestic Equity | 0.30% |
| Lazard Emerging Markets Equity Instl | 1.08 % | International Equity | 0.50% |
| Neuberger Berman High Income Bond R6 | 0.60 % | Domestic Bond | 0.39% |
| American Century Real Estate R6 | 0.81 % | Domestic Equity | 0.30% |

| Current Fund | ER | Category | ICI Median |
|---|---|---|---|
| T. Rowe Price New Era I | 0.56 % | Domestic Equity | 0.30% |

86.     The high cost of the Plan's funds is even more stark when comparing the Plan's funds to the average fees of funds in similarly-sized plans:

| Current Fund | ER | Category | ICI Avg. |
|---|---|---|---|
| T. Rowe Price Blue Chip Growth I | 0.56 % | Domestic Equity | 0.35% |
| Baron Growth Instl. | 1.04 % | Domestic Equity | 0.35% |
| Neuberger Berman Genesis R6 | 0.75 % | Domestic Equity | 0.35% |
| Fidelity Treasury Only Money Market | 0.42 % | Money Market | 0.15% |
| Hotchkis & Wiley Mid-Cap Value I | 1.03 % | Domestic Equity | 0.35% |
| Lazard Emerging Markets Equity Instl | 1.08 % | International Equity | 0.48% |
| Neuberger Berman High Income Bond R6 | 0.60 % | Domestic Bond | 0.30% |
| American Century Real Estate R6 | 0.81 % | Domestic Equity | 0.35% |
| T. Rowe Price New Era I | 0.56 % | Domestic Equity | 0.35% |

87.     Given the excessive costs of the above funds they should have been replaced during the Class Period.

**(3) There Have Been Five Underperforming Funds in the Plan From 2014 through May 2020**

88.     Another indication of Defendants' lack of a prudent process to monitor Plan funds was their failure to remove five underperforming funds during the Class Period: the Hotchkis & Wiley Mid-Cap Value I, American Funds Europacific Growth R6, Lazard Emerging Markets Equity Instl., Templeton Global Bond R6 and the T.Rowe Price New Era I.  These funds have underperformed as follows as of June 30, 2020:

| Fund | Total Return % (% rank in peer group) | | | |
|---|---|---|---|---|
| | **1-Year** | **3-Year** | **5-Year** | **10-Year** |
| Hotchkis & Wiley Mid-Cap Value I | -31.62 (100) | -12.50 (100) | -6.43 (99) | 6.02 (98) |
| # of Peers | 425 | 408 | 393 | 324 |
| American Funds Europacific Growth R6 | 3.17 (65) | 4.76 (60) | 4.90 (51) | 7.48 (50) |
| # of Peers | 497 | 473 | 427 | 344 |
| Lazard Emerging Markets Equity Instl | -15.93 (94) | -4.80 (94) | -1.10 (92) | 1.32 (91) |
| # of Peers | 824 | 751 | 685 | 358 |
| Templeton Global Bond R6 | -5.96 (87) | -0.79 (84) | 0.70 (83) | 2.88 (46) |
| # of Peers | 320 | 300 | 275 | 113 |
| T.Rowe Price New Era  I | -19.76 (64) | -4.62 (57) | -2.27 (53) | 1.34 (41) |
| # of Peers | 115 | 108 | 103 | 94 |

89.     Given the clear underperformance of the above funds, especially during the last five years, and because they had expense ratios considerably above median and average expense ratios, they should have been replaced during the Class Period.

**(4)   Failure to Investigate Availability of Lower Cost Collective Trusts**

90.     Although a good gauge of Defendants' imprudence, median-based and average-based comparisons still understate the excessiveness of the investment management fees of the Plan funds because many prudent alternative funds were available (which Defendants failed to consider) that offered lower expenses than the median and average fees.

91.     Plan fiduciaries such as Defendants here must be continually mindful of investment options to ensure they do not unduly risk plan participants' savings and do not charge unreasonable fees.  Some of the best investment vehicles for these goals are collective trusts (also referred to as CITs), which pool plan participants' investments further and provide lower fee alternatives to even institutional shares of mutual funds.[10]

92.     Indeed, fiduciary best practices requires that fiduciaries inquire as to the availability of lower-cost investment alternatives like collective trusts.  "Best Practices for Plan Fiduciaries," at 36.  The use of collective trusts is also endorsed under trust law from which ERISA is derived. *Tibble*, 135 S. Ct. at 1828.  Trust law states to determine whether a fiduciary has selected appropriate funds for the trust, appropriate comparators may include "return rates of one or more **suitable common trust funds**, or suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts § 100 cmt. b(1) (emphasis added).

93.     Another indication of Defendants' fiduciary breaches was the failure to timely consider available collective trusts for the Fidelity funds which were available on the market in

---

[10] Collective trusts are administered by banks or trust companies, which assemble a mix of assets such as stocks, bonds and cash. Regulated by the Office of the Comptroller of the Currency rather than the Securities and Exchange Commission, collective trusts have simple disclosure requirements, and cannot advertise or issue formal prospectuses. As a result, their costs are much lower, with lower or no administrative costs, and lower or no marketing or advertising costs. *See* Powell, Robert, "Not Your Normal Nest Egg," The Wall Street Journal, March 2013, available at http://www.wsj.com/articles/SB10001424127887324296604578177291881550144.

October of 2007.[11] The failure is inexplicable given that the Committee knew or should have known of the benefits and propriety of collective trusts because the Plan Document itself permits investment in collective trusts. As described in the Plan Document, the investments in the Plan may include "assets or shares in a common or collective trust fund, pooled investment fund, mutual fund, or other commingled investment, including any pooled or common fund or mutual fund." Plan Doc. at 70.

94.     Accordingly, prior to 2018 the Plan incurred excess fees due to Defendants' failure to adequately investigate the availability of Fidelity collective trusts which had the same asset allocation as the Fidelity target date mutual funds in the Plan.  Because of the Plan's significant concentration in Fidelity target date funds, it could have reaped considerable cost savings by using collective trusts, but Defendants failed to investigate, or blatantly ignored, this option.

95.     A prudent fiduciary conducting an impartial review of the Plan's investments would have identified the following funds that should have been converted to collective trusts at the earliest opportunity:

---

[11] The criticisms that have been launched against collective trust vehicles in the past no longer apply. Collective trusts use a unitized structure and the units are valued daily; as a result, participants invested in collective trusts are able to track the daily performance of their investments online. *Use of CITs in DC Plans Booming*; Paula Aven Gladych, *CITs Gaining Ground in 401(k) Plans*, EMPLOYEE BENEFIT NEWS (Apr. 14, 2016), available at http://www.benefitnews.com/news/cits-gaining-ground-in-401-k-plans (hereinafter "*CITs Gaining Ground*"). Many if not most mutual fund strategies are available in a collective trust format, and the investments in the collective trusts are identical to those held by the mutual funds. *Use of CITs in DC Plans Booming; CITs Gaining Ground*. And because collective trusts contract directly with the plan, and provide regular reports regarding costs and investment holdings, the plan has the same level of protection that the Investment Company Act provides to individual investors, thus eliminating the need for the protections of the Investment Company Act. Further, collective trusts are still subject to state and federal banking regulations that provide comparable protections. American Bankers Association, ABA Primer on Bank Collective Funds, June 2015, at 1, available at https://www.aba.com/advocacy/policy-analysis/primer-bank-collective-investment-funds.

| Fund in Plan | Exp. Ratio[12] | Collective Trust Version | Incep Date | Exp. Ratio[13] | % Fee Excess |
|---|---|---|---|---|---|
| Fidelity Freedom Income K | 0.42% | FIAM Blend Target Date Income Fund Q | Oct. 31 2007 | 0.32% | 27% |
| Fidelity Freedom K 2005 Fund | 0.42% | FIAM Blend Target Date 2005 Q Fund | Oct. 31 2007 | 0.32% | 31% |
| Fidelity Freedom K 2010 Fund | 0.46% | FIAM Blend Target Date 2010 Q Fund | Oct. 31 2007 | 0.32% | 44% |
| Fidelity Freedom K 2015 Fund | 0.49% | FIAM Blend Target Date 2015 Q Fund | Oct. 31 2007 | 0.32% | 53% |
| Fidelity Freedom K 2020 Fund | 0.53% | FIAM Blend Target Date 2020 Q Fund | Oct. 31 2007 | 0.32% | 66% |
| Fidelity Freedom K 2025 Fund | 0.56% | FIAM Blend Target Date 2025 Q Fund | Oct. 31 2007 | 0.32% | 75% |
| Fidelity Freedom K 2030 Fund | 0.60% | FIAM Blend Target Date 2030 Q Fund | Oct. 31 2007 | 0.32% | 88% |
| Fidelity Freedom K 2035 Fund | 0.63% | FIAM Blend Target Date 2035 Q Fund | Oct. 31 2007 | 0.32% | 97% |
| Fidelity Freedom K 2040 Fund | 0.65% | FIAM Blend Target Date 2040 Q Fund | Oct. 31 2007 | 0.32% | 103% |
| Fidelity Freedom K 2045 Fund | 0.65% | FIAM Blend Target Date 2045 Q Fund | Oct. 31 2007 | 0.32% | 103% |
| Fidelity Freedom K 2050 Fund | 0.65% | FIAM Blend Target Date 2050 Q Fund | Oct. 31 2007 | 0.32% | 103% |
| Fidelity Freedom K 2055 Fund | 0.65% | FIAM Blend Target Date 2055 Q Fund | July 12 2011 | 0.32% | 103% |
| Fidelity Freedom K 2060 Fund | 0.65% | FIAM Blend Target Date 2060 Q Fund | May 15 2015 | 0.32% | 103% |

---

[12] The listed expense figures are as of 2020.

[13] The listed expense figures are as of 2020.

96.     The above is for illustrative purposes only.  During the Class Period, Defendants knew or should have known of the existence of these available collective trusts and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

97.     Minimum initial investment amounts are typically waived for institutional investors like retirement plans.  *See, e.g., Davis, et al. v. Washington Univ., et al.*, 960 F.3d 478, at 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda,* 923 F.3d at 329 (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).   Here, "[t]he eligibility requirement for FIAM Blend Target Date is $25 million in client assets."  *See* Fidelity Pricing Options for Retirement Plans as of Dec. 31, 2019 ("Fidelity Pricing"), p. 11.  And, "[c]lient assets is defined as assets invested in qualified defined contribution plans only, which are profit sharing, 401(k), and defined benefit plans that are qualified under Section 401(a) and governmental plans that are described in section 401(a)24 of the IRS code."  *Id.*

98.     Target date funds are sold as a package with the minimum investment amount referring to the total amount invested across all target date funds. In 2017, for example, the Plan had twelve Fidelity Freedom target date funds ranging from an expected retirement date of 2005 to 2060 at five-year intervals.  A minimum needed to qualify refers to the total of all assets held in all of the 12 funds collectively.  Looking at 2017, the Plan had over $283 million dollars invested in Fidelity target date funds.

99.     Clearly, per the below chart, the Plan had sufficient assets under management during the Class Period to qualify for Fidelity collective trusts: [14]

---

[14] As further evidence that the Plan could have moved to collective trusts throughout the Class Period, the Plan did in fact move to collective trusts in 2018. Clearly this move should have been

| Fund in the Plan | 2017 AUM | 2016 AUM | 2015 AUM | 2014 AUM |
|---|---|---|---|---|
| Fidelity Freedom 2005 through 2060 K Funds and Freedom K Income Fund[15] | $283,057,553 | $230,552,599 | $200,027,564 | $191,227,329 |

100.　There is no good-faith explanation for utilizing higher-cost funds when lower-cost funds are available for the exact same investment.  Indeed, given that the collective trusts were comprised of the same underlying investments as their mutual fund counterparts, and managed by the same investment manager, but had lower fees, they generally had greater returns when looking at the 1, 3, 5, and 10 year average annual returns.  Moreover, the Plan did not receive any additional services or benefits based on its use of more expensive funds; the only consequence was higher costs for Plan participants.  Defendants failed in their fiduciary duties either because they did not negotiate aggressively enough with their service providers to obtain better pricing or they were asleep at the wheel and were not paying attention.  Either reason is inexcusable.

**(5)　One of the Plan's Funds With Substantial Assets Was Not in the Lowest Fee Share Class Available to the Plan**

101.　Another fiduciary breach stemming from Defendants' flawed investment monitoring system resulted in the failure to identify available lower-cost share classes of many of the funds in the Plan during the Class Period.

102.　Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.  Because the institutional share

made as soon as these collective trusts became available in 2007. In fact, the Plan moved to the R series target date fund which have a much higher minimum investment amount than the Q series.
[15] Target date funds are negotiated and sold as a package. The minimum buy in amount for target date funds is based on the amount under management for all target date funds in any given Plan. Here FIAM Blend Target Date Q Funds, only required a $25 million investment amount. Clearly, the Plan would have qualified for these CITs throughout the Class Period. In 2014 through 2017, the Plan did not have 2055 and 2060 target date funds. Fidelity considers its Freedom Income Fund to be part of its target date series.

classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary.  *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

103.    Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plan.  *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24).

104.    The assets under management for the Vanguard Small Cap Growth Index Investor was over 40 million dollars thus easily qualifying it for lower share classes.  The following chart provides detail on this fund:

| Fund in the Plan | Exp. Ratio | Less Expensive Share Class | Less Expensive Expense Ratio | Excess Cost |
|---|---|---|---|---|
| VISGX $ 40,293,856 Vanguard Small Cap Growth Index Inv | 0.19 % | VSGIX Vanguard Small Cap Growth Index I | 0.06 % | 217% |

105.    The above is for illustrative purposes only.  At all times during the Class Period, Defendants knew or should have known of the existence of cheaper share classes and therefore also should have immediately identified the prudence of transferring the Plan's funds into these alternative investments.

106.    Jumbo defined contribution plans such as the Plan have sufficient assets to qualify for the lowest cost share class available.  Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for jumbo plans like the Plan.  *See, e.g., Davis et al. v.*

*Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

107.    There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds ***could not have*** (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plan did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs for Plan participants.

108.    Defendants made investments with higher costs (higher expense ratios) available to participants while the same investments with lower costs (lower expense ratios) were available to the detriment of the compounding returns that participants should have received.  This reduces the likelihood that participants achieve their preferred lifestyle in retirement.

109.    Simply put, a fiduciary to a large defined contribution plan such as the Plan can use its asset size and negotiating power to invest in the cheapest share class available.  For this reason, prudent retirement plan fiduciaries will search for and select the lowest-priced share class available.

110.    Indeed, recently a court observed that "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved…in this case would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share

classes provide identical investments at lower costs – to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at * 13 (C.D. Cal. Aug. 16, 2017).

111.    Here, had the Plan's fiduciaries prudently undertook their fiduciary responsibility for "oversight of the Plan, determin[ing] the appropriateness of the Plan's investment strategy, and monitor[ing] investment performance" the Plan would have moved to the identical lower cost share class of the identical fund. 2018 Auditor Report at 7.

### (6)    Failure to Investigate Certain Lower Cost Passively Managed Funds

112.    Alternatively, another indication of Defendants' imprudent management of the Plan was their failure to investigate the benefits vs. drawbacks of selecting available passively managed Fidelity target date funds to replace the funds already in the Plan.

113.    Vanguard's white paper on investment management fees, "Vanguard's Principles for Investing Success," talks about the importance of minimizing costs.  Importantly, "[m]arkets are unpredictable.  Costs are forever." *Id.* at 17. [16] Vanguard lays out four bullet points all investors must keep in mind: higher costs can significantly depress a portfolio's growth over long periods; costs create an inevitable gap between what the markets return and what investors actually earn – but keeping expenses down can help narrow that gap; lower-cost mutual funds have tended to perform better than higher-cost funds over time; and indexed investments can be a useful tool for cost control. *Id.*

114.    As noted *supra*, ERISA is derived from trust law.  *Tibble*, 135 S. Ct. at 1828. Accordingly, appropriate investments for a fiduciary to consider are "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)."  Restatement (Third) of Trusts § 100 cmt. b(1).

---

[16] Available at https://about.vanguard.com/what-sets-vanguard-apart/principles-for-investing-success/

115.    The majority of U.S. equity funds did not outperform their index counterparts in the five years ending June 30, 2019:[17]

| Fund Category | Comparison Index | Percentage of Funds That Underperformed Their Benchmark  5 Yr (%) |
|---|---|---|
| Large-Cap | S&P 500 | 78.52 |
| Mid-Cap | S&P MidCap 400 | 63.56 |
| Small-Cap | S&P SmallCap 600 | 75.09 |
| Multi-Cap | S&P Composite 1500 | 82.79 |
| Domestic Equity | S&P Composite 1500 | 81.66 |
| Large-Cap Value | S&P Value | 84.74 |
| Mid-Cap Value | S&P MidCap 400 Value | 92.31 |

116.    Digging deeper, other statistics bear out the vast underperformance of actively managed funds over passively managed funds over different stretches of 5 to 10 year periods beginning in 2008.

117.    77.97% of large-cap mutual fund managers and 73.21% of institutional accounts underperformed the S&P 500® on a gross-of-fees basis over the 10-year horizon between 2008 and 2018.[18]

118.    The following chart denotes Domestic Equity-Percentage of Managers Underperforming over ten years as of December 31, 2018.[19]

| Category | Benchmark | Mutual Funds (%) Net/ Gross of Fees |
|---|---|---|

---

[17] Source: https://us.spindices.com/spiva/#/reports.

[18] *See* SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, September 18th, 2019 p. 1.

[19] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, September 18th, 2019, Exhibit 2, p.6.

| All Domestic | S&P Comp 1500 | 84.49/75.58 |
| All L/C | S&P 500 | 85.14/ 77.97 |
| All M/C | S&P M/C 400 | 88.03/ 76.25 |
| All S/C | S&P S/C 600 | 85.67/ 76.01 |
| All Multi/C | S&P Comp 1500 | 86.36/ 77.90 |

119.    It is the same story looking at different five-year intervals over the last decade.  In 2015, over 76.23% of mutual fund managers and 85.81% of institutional accounts in the large-cap equity space underperformed the S&P 500®. In the mid-cap space, 65.81% of mutual funds and 64.71% of institutional accounts underperformed the S&P MidCap 400®.  In the small-cap space, over 80% of managers on both fronts underperformed the S&P SmallCap 600®.  The findings in the small-cap space dispel the myth that small-cap equity is an inefficient asset class that is best accessed via active management.

120.    Undeniably, fees play a major role in the active versus passive debate. After subtracting fees, returns from active management tend to be less than those from passive management, as the latter costs less.[20]

121.    The following chart denotes Domestic Equity-Percentage of Managers Underperforming over five years as of December 31, 2015.[21]

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 88 | 79.85 | 85.00 |
| All L/C | S&P 500 | 84.13 | 76.23 | 85.51 |
| All M/C | S&P M/C 400 | 76.69 | 65.81 | 64.71 |
| All S/C | S&P S/C 600 | 90.13 | 81.11 | 81.82 |
| All Multi/C | S&P Comp 1500 | 88.56 | 79.67 | 83.20 |

---

[20] Sharpe, William F., "The Arithmetic of Active Management" Financial Analysts Journal, January/February 1991, Volume 47 Issue 1. "Properly measured, the average actively managed dollar must underperform the average passively managed dollar, net of costs."

[21] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, July 31st, 2016, Exhibit 2, p.5.

122.   In 2016, in the large-cap equity space, 84.60% of mutual fund managers and 79.58% of institutional accounts underperformed the S&P 500® on a net-of-fees basis. When measured on a gross-of-fees basis, 68.16% of large-cap mutual funds and 69.20% of institutional accounts underperformed.

123.   Similarly, in the mid-cap space, 96.03% (86.24%) of mutual funds and 92.02% (82.51%) of institutional accounts underperformed the S&P MidCap 400® on a net (gross) basis. In the small-cap space, over 80% of managers on both fronts underperformed the S&P SmallCap 600®, regardless of fees.

124.   The following chart denotes Domestic Equity-Percentage of Managers Underperforming over five years as of December 31, 2016.[22]

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % N/G |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 82.87 | 67.11 | 76.31/65.52 |
| All L/C | S&P 500 | 84.60 | 68.16 | 79.58/69.20 |
| All M/C | S&P M/C 400 | 96.03 | 86.24 | 92.02/82.51 |
| All S/C | S&P S/C 600 | 95.64 | 81.40 | 90.61/78.91 |
| All Multi/C | S&P Comp 1500 | 89.31 | 77.67 | 81.31/70.33 |

125.   In 2017, the majority of equity managers in 15 out of 17 categories underperformed their respective benchmarks over the 10-year horizon, gross-of-fees.[23]  In the preceding ten years in the large-cap equity space, 89.51% of mutual fund managers and 73.61% of institutional accounts lagged the S&P 500® on a net-of-fees basis. When measured on a gross-of-fees basis, 71.97% of large-cap mutual funds and 62.88% of institutional accounts underperformed.  Over

---

[22] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, August 8th, 2017, Exhibit 2, p.5

[23] *See* SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, January 8th, 2019, p. 1.

80% of mutual funds underperformed the S&P SmallCap 600® (net- and gross-of-fees) over the last decade, while 86.80% (72.92%) of institutional accounts underperformed on a net (gross) basis.

126.    The following chart denotes Domestic Equity-Percentage of Managers Underperforming over ten years as of December 31, 2017.[24]

| Category | Benchmark | Mutual Funds (%) Net of Fees | Mutual Funds % Gross of Fees | Inst. Accts % N/G |
|---|---|---|---|---|
| All Domestic | S&P Comp 1500 | 86.65 | 71.20 | 71.11/59.88 |
| All L/C | S&P 500 | 89.51 | 71.97 | 73.61/ 62.88 |
| All M/C | S&P M/C 400 | 96.48 | 85.37 | 85.16/ 77.01 |
| All S/C | S&P S/C 600 | 95.71 | 82.00 | 86.80/ 72.92 |
| All Multi/C | S&P Comp 1500 | 90.70 | 78.77 | 79.00/ 68.59 |

127.    Based on the above data, the Plan fiduciaries should have specifically considered Fidelity's passively managed alternative to the actively managed target date funds.  Among its several target date offerings, two of Fidelity's target date suites are the Freedom funds (the "Active suite") and the substantially less costly and less risky Freedom Index funds (the "Index suite").  A simple weighing of the benefits of the two suites indicates that the Index suite is a far superior option, and consequently the more appropriate choice for the Plan.

128.    The two fund families have nearly identical names and share a management team.[25] But while the Active suite invests predominantly in actively managed Fidelity mutual funds,[26] the Index suite places no assets under active management, electing instead to invest in Fidelity funds that simply track market indices.  The Active suite is also dramatically more expensive than the

---

[24] Data obtained from SPIVA® Institutional Scorecard– How Much Do Fees Affect the Active Versus Passive Debate?, January 8th, 2019, Exhibit 2, p.5.

[25] Both target date suites have been managed by Brett Sumsion and Andrew Dierdorf since 2014. Finola McGuire Foley was added to the Index suite team in 2018.

[26] Per Morningstar, the Active suite's underlying holdings are 88.8% actively managed, by asset weight.

Index suite, and riskier in both its underlying holdings and its asset allocation strategy. Defendants' decision not to replace the Active suite with the Index suite at any point during the Class Period, constitutes a breach of their fiduciary duties.

129.    The fees charged by the Active suite are many multiples higher than the Index suite's industry-leading low costs.  While the Institutional Premium share class for each target year of the Index suite charges only 8 basis points (0.08%), the K share class of the Active suite—which the Plan offered up until 2018 —had expense ratios ranging from 42 basis points (0.42%) to 65 basis points (0.65%).  Even with the switch to the actively managed collective trusts in 2018, the expense ratio was 32 basis points (.32), still well above the expense ratio for the Index suite.

130.    Morningstar assigns each mutual fund in its extensive database a star rating, which is a "purely mathematical measure that shows how well a fund's past returns have compensated shareholders for the amount of risk it has taken on."  This measurement emphatically favors the Index suite.  Each Fidelity Freedom Index fund bears a higher star rating than the corresponding Active fund (other than the Income and 2005 Index Funds, which have the same 3 stars as the Income and 2005 Active Funds).  With the exception of the Income, 2005, and 2060 iterations, the full Index suite is assigned 5 stars, Morningstar's highest rating.  The risk-adjusted returns of funds with a 5-star rating rank in the top 10% of their peers.  The Active suite does not achieve a single 5-star rating, and only receives one 4-star rating:

| Morningstar Ratings | | | | | |
|---|---|---|---|---|---|
| Freedom Suite | Ticker | Stars | Freedom Index Suite | Ticker | Stars |
| Income K | FNSHX | 3 | Income Inst Prem | FFGZX | 3 |
| 2005 K | FSNJX | 3 | 2005 Inst Prem | FFGFX | 3 |
| 2010 K | FSNKX | 3 | 2010 Inst Prem | FFWTX | 5 |
| 2015 K | FSNLX | 3 | 2015 Inst Prem | FIWFX | 5 |
| 2020 K | FSNOX | 4 | 2020 Inst Prem | FIWTX | 5 |
| 2025 K | FSNPX | 3 | 2025 Inst Prem | FFEDX | 5 |
| 2030 K | FSNQX | 3 | 2030 Inst Prem | FFEGX | 5 |
| 2035 K | FSNUX | 3 | 2035 Inst Prem | FFEZX | 5 |

| Morningstar Ratings | | | | | |
|---|---|---|---|---|---|
| Freedom Suite | Ticker | Stars | Freedom Index Suite | Ticker | Stars |
| 2040 K | FSNVX | 3 | 2040 Inst Prem | FFIZX | 5 |
| 2045 K | FSNZX | 3 | 2045 Inst Prem | FFOLX | 5 |
| 2050 K | FNSBX | 3 | 2050 Inst Prem | FFOPX | 5 |
| 2055 K | FNSDX | 3 | 2055 Inst Prem | FFLDX | 5 |
| 2060 K | FNSFX | 3 | 2060 Inst Prem | FFLEX | 4 |

131.    Additionally, the Index suite has outperformed the Active suite on a trailing in the last three-and-five year annualized basis:

| 3-Year Trailing Performance as of 8/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 5.17% | Income Inst Prem | 5.81% | -0.64% |
| 2005 K | 5.68% | 2005 Inst Prem | 6.34% | -0.66% |
| 2010 K | 6.26% | 2010 Inst Prem | 6.98% | -0.72% |
| 2015 K | 6.76% | 2015 Inst Prem | 7.58% | -0.82% |
| 2020 K | 7.15% | 2020 Inst Prem | 8.09% | -0.94% |
| 2025 K | 7.51% | 2025 Inst Prem | 8.46% | -0.95% |
| 2030 K | 8.07% | 2030 Inst Prem | 9.11% | -1.04% |
| 2035 K | 8.45% | 2035 Inst Prem | 9.61% | -1.16% |
| 2040 K | 8.49% | 2040 Inst Prem | 9.73% | -1.24% |
| 2045 K | 8.51% | 2045 Inst Prem | 9.73% | -1.22% |
| 2050 K | 8.50% | 2050 Inst Prem | 9.73% | -1.23% |
| 2055 K | 8.51% | 2055 Inst Prem | 9.74% | -1.23% |
| 2060 K | 8.50% | 2060 Inst Prem | 9.73% | -1.23% |

| 5-Year Trailing Performance as of 8/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| Income K | 5.35% | Income Inst Prem | 5.25% | 0.10% |
| 2005 K | 6.14% | 2005 Inst Prem | 6.10% | 0.04% |
| 2010 K | 6.86% | 2010 Inst Prem | 6.88% | -0.02% |
| 2015 K | 7.52% | 2015 Inst Prem | 7.64% | -0.12% |
| 2020 K | 8.01% | 2020 Inst Prem | 8.21% | -0.20% |
| 2025 K | 8.42% | 2025 Inst Prem | 8.71% | -0.29% |
| 2030 K | 9.27% | 2030 Inst Prem | 9.69% | -0.42% |
| 2035 K | 9.85% | 2035 Inst Prem | 10.38% | -0.53% |
| 2040 K | 9.89% | 2040 Inst Prem | 10.48% | -0.59% |

| 5-Year Trailing Performance as of 8/31/20 | | | | |
|---|---|---|---|---|
| Freedom Suite | Return | Freedom Index Suite | Return | Difference |
| 2045 K | 9.90% | 2045 Inst Prem | 10.48% | -0.58% |
| 2050 K | 9.89% | 2050 Inst Prem | 10.49% | -0.60% |
| 2055 K | 8.89% | 2055 Inst Prem | 10.48% | -0.59% |
| 2060 K | 9.87% | 2060 Inst Prem | 10.48% | -0.60% |

132.    Lastly, the flow of funds to, or from, target date families constitutes one indicator of the preferences of investors at large.   According to Morningstar's report on the 2019 Target Date Fund Landscape,  investor demand for low-cost target date options has skyrocketed in recent years.  Following suit, the Index suite has seen significant inflows, receiving an estimated $4.9 billion in new funds in 2018 alone.  At the same time, investor confidence in the Active suite has deteriorated; 2018 saw the series experience an estimated $5.4 billion in net outflows.  The movement of funds out of the Active suite has been substantial for years.

133.    A March 2018 Reuters special report[27] on the Fidelity Freedom funds (the "Reuters Report") details how many investors lost confidence in the Active suite "because of their history of underperformance, frequent strategy changes and rising risk."   The Reuters Report notes that nearly $16 billion has been withdrawn from the fund family over the prior four years.  Defendants' failure to consider the Index suite for the Plan evidences their failure to acknowledge, or act upon, investors' crumbling confidence in the Active suite, while ignoring the simultaneous and justified surge in faith in the Index suite.

134.    Defendants' failure to investigate lower cost alternative investments during the Class Period cost the Plan and its participants millions of dollars.

**B.      Defendants Breached Their Duty of Loyalty to the Plan and Its Participants**

---

[27]"Special Report: Fidelity puts 6 million savers on risky path to retirement", https://www.reuters.com/article/us-funds-fidelity-retirement-special-rep/special-report-fidelity-puts-6-million-savers-on-risky-path-to-retirement-idUSKBN1GH1SI.

135.     The structure of this Plan is rife with potential conflicts of interest because Fidelity and its affiliates were placed in positions that allowed them to reap profits from the Plan at the expense of Plan participants.  Here, the trustee, one of the Plan's fiduciaries is Fidelity and an affiliate or division of Fidelity performs the recordkeeping services for the Plan.

136.     This conflict of interest is laid bare in this case where the Plan includes many funds offered by Fidelity.  As demonstrated above, there were many alternative lower-cost funds – materially similar or identical to the Plan's other funds (other than in price) – available but not selected because the higher-cost funds returned more value to Fidelity.

137.     There appears to be no reasonable justification for the millions of dollars collected from Plan participants that ended up in Fidelity's coffers.

138.     The Defendants, and the fiduciaries to whom it delegated authority, breached their duty of undivided loyalty to Plan participants by failing to adequately supervise Fidelity and its affiliates and ensure that the fees charged by Fidelity and its affiliates were reasonable and in the best interests of the Plan and its participants.  Clearly, Defendants failed this aspect of their fiduciary duties.

### FIRST CLAIM FOR RELIEF
### Breaches of Fiduciary Duties of Loyalty and Prudence
### (Asserted against the Committee)

139.     Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

140.     At all relevant times, the Committee Defendants and its members ("Prudence/Loyalty Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

141.    As fiduciaries of the Plan, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

142.    The Prudence/Loyalty Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of the Plan's participants.  Instead, the Prudence/Loyalty Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. The Prudence/Loyalty Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan.

143.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns.  Had Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

144.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Prudence/Loyalty Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties, and also must restore any profits resulting from such breaches.  In addition, Plaintiffs are entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

145.    The Prudence/Loyalty Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit

breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

### SECOND CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries
### (Asserted against the Board and Amway)

146. Plaintiffs re-allege and incorporate herein by reference all prior allegations in this Complaint as if fully set forth herein.

147. The Board Defendants and Amway (the "Monitoring Defendants") had the authority and obligation to monitor the Committee and was aware that the Committee had critical responsibilities as a fiduciary of the Plan.

148. In light of this authority, the Monitoring Defendants had a duty to monitor the Committee and ensure that the Committee was adequately performing its fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that the Committee was not fulfilling those duties.

149. The Monitoring Defendants also had a duty to ensure that the Committee possessed the needed qualifications and experience to carry out its duties; had adequate financial resources and information; maintained adequate records of the information on which it based its decisions and analysis with respect to the Plan's investments; and reported regularly to the Monitoring Defendants.

150. The Monitoring Defendants breached their fiduciary monitoring duties by, among other things:

(a)      Failing to monitor and evaluate the performance of the Committee or have a system in place for doing so, standing idly by as the Plan suffered significant losses as a result of the Committee's imprudent actions and omissions;

(b)      failing to monitor the processes by which the Plan's investments were evaluated and the Committee's failure to investigate the availability of lower-cost share classes; and

(c)      failing to remove the Committee as a fiduciary whose performance was inadequate in that it continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, and caused the Plan to pay excessive recordkeeping fees, all to the detriment of the Plan and the retirement savings of the Plan's participants.

151.    As a consequence of the foregoing breaches of the duty to monitor, the Plan suffered millions of dollars of losses.  Had Monitoring Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and participants of the Plan would have had more money available to them for their retirement.

152.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), the Monitoring Defendants are liable to restore to the Plan all losses caused by their failure to adequately monitor the Committee. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in their Prayer for Relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs pray that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

A. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative, Rule 23(b)(2) of the Federal Rules of Civil Procedure;

B. Designation of Plaintiffs as Class Representatives and designation of Plaintiffs' counsel as Class Counsel;

C. A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

D. An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

E. An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

F. Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

G. An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

H.      Other equitable relief to redress Defendants' illegal practices and

to enforce the provisions of ERISA as may be appropriate, including appointment

of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's

fiduciaries deemed to have breached their fiduciary duties;

I.      An award of pre-judgment interest;

J.      An award of costs pursuant to 29 U.S.C. § 1132(g);

K.      An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and

the common fund doctrine; and

L.      Such other and further relief as the Court deems equitable and just.

Date: November 9, 2020                  **CAPOZZI ADLER, P.C.**

                                        /s/ Donald R. Reavey                .
                                        Donald R. Reavey, Esquire
                                        PA Attorney ID #82498
                                        2933 North Front Street
                                        Harrisburg, PA 17110
                                        donr@capozziadler.com
                                        (717) 233-4101
                                        Fax (717) 233-4103

                                        /s/ Mark K. Gyandoh                .
                                        Mark K. Gyandoh, Esquire
                                        PA Attorney ID # 88587
                                        **CAPOZZI ADLER, P.C.**
                                        312 Old Lancaster Road
                                        Merion Station, PA 19066
                                        markg@capozziadler.com
                                        (610) 890-0200
                                        Fax (717) 233-4103

                                        Counsel for Plaintiffs and the Putative Class