UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOSHUA GARCIA, *et al.*,                   )
                    Plaintiffs,            )
                                           )      No. 1:20-cv-1078
v.                                         )
                                           )      Honorable Paul L. Maloney
ALTICOR, INC., *et al.*,                   )
                    Defendants.            )
_____)

## OPINION AND ORDER

This action comes before the Court on two motions. First, Defendants moved to exclude the opinions of Eric Dyson, who is Plaintiffs' ERISA expert. (ECF No. 86). Second, Defendants moved for summary judgment on Plaintiffs' claims. (ECF No. 80). On March 27, 2024 the Court held oral argument on the two motions. The Court will deny in part and grant in part Defendants' motion to exclude Dyson and his testimony. The Court will deny in part and grant in part Defendants' motion for summary judgment.

## I. Background

This is a class action brought under §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plan's fiduciaries, which include Alticor Inc. ("Amway" or "Company") and the Board of Directors of Alticor Inc. and its members during the Class Period ("Board") and the Fiduciary Committee of Alticor Inc. and its members during the Class Period ("Committee") for breaches of their fiduciary duties. (ECF No. 1).

Defendants in this case are Amway, the Board, and the Committee. The three named Plaintiffs (Joshua Garcia, Andrea Brandt, and Howard Hart) are now-retired Amway employees who participated in Amway's defined-contribution 401(k) plan (the "Plan") while they were employed by Amway. The Plan is a defined-contribution plan, meaning participants' benefits are limited to the value of their investment accounts, which is determined by the market performance of employee and employer contributions, less expenses. (ECF No. 1 at ¶ 46). Plan participants may only invest in the investment options on the Plan's investment menu, but the Plan offers employees a range of options. During the relevant period, the Plan offered 22 or 23 investment options. The Plan has had at least a billion dollars in assets under management at all relevant times; on December 31, 2018, it had $1.19 billion. (*Id.* at ¶ 56).

The Committee is the Plan's fiduciary and overseer. The Committee is responsible for selecting and monitoring the investments in the Plan. (*Id.* at ¶ 33). The Committee has the authority to select, monitor, evaluate, and modify the Plan's investments, subject to the ultimate oversight and direction of Amway. (*Id.* at ¶¶ 34, 55). The essence of the complaint is that the Committee did not give adequate attention to the investments in the Plan. Plaintiffs challenge the performance and/or fees of many of the investment options that the Plan has included since 2014. (*Id.* at ¶¶ 139-145).

A brief overview of the types of relevant fees is helpful. Investment-management fees are ongoing charges for managing the assets in the investment fund. These are often expressed in the form of an "expense ratio" which is a percentage deduction against a participant's total assets in their investment. (*Id.* at ¶ 70). For example, a participant who

invests $1,000 in a fund with an expense ratio of 0.10% will pay an annual fee of $1,000 x 0.001 = $1. Recordkeeping fees cover the "day-to-day" expenses of keeping the funds running. (*Id.* at ¶ 63). One way to charge recordkeeping fees is via revenue sharing, which allows mutual funds to pay the administrator via the performance of the fund. (*Id.*). For example, if an investment's expense ratio is 0.40%, the investment manager would "share" (pay) a portion of the 0.40% fee ("revenue") it collects with the plan's recordkeeper for the services that the recordkeeper provides.

Plaintiffs allege that the Committee's failure to even attempt to provide better investments was a breach of the fiduciary duties of loyalty and prudence (Count I). Plaintiffs also allege that Amway and the Board did not sufficiently monitor the Committee's decisions and actions (Count II). Plaintiffs have filed this action as a putative class action. The accusations are that Defendants breached their fiduciary duties owed under ERISA by (1) failing to administer the Plan in a prudent manner; (2) failing to adequately monitor the Plan's recordkeeping expenses; (3) selecting and retaining funds with investment management fees in excess of fees for similarly sized plans; (4) selecting and retaining five underperforming funds in the Plan from 2014 through May 2020; (5) failing to investigate the availability of lower cost collective trusts; (6) retaining a higher cost share class for one fund offered in the Plan; (7) failing to investigate certain lower cost, passively managed funds; and (8) breaching their duty of loyalty to the Plan and its participants. (ECF No. 1 at PID 14-39).

## II. Legal Standards

### A. *Daubert* and FRE 702

Rule 702 of the Federal Rules of Evidence governs the admission of testimony by expert witnesses. A witness can be qualified as an expert by knowledge, skill, experience, training, or education. Fed. R. Evid 702. Rule 702 permits a qualified expert witness if:

> the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

*Id.* District courts must ensure that expert testimony or evidence admitted be both relevant and reliable. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1999). Rule 702's inquiry is "a flexible one." *Id.* at 594. "The focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Id.*

The Supreme Court identified several factors for district courts to consider when evaluating scientific expert testimony, but there is no "definitive checklist or test." *Daubert*, 509 U.S. at 590. These factors include: "the testability of the expert's hypotheses (whether they can be or have been tested), whether the expert's methodology has been subjected to peer review, the rate of error associated with the methodology, and whether the methodology is generally accepted within the scientific community." *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000) (citing *Daubert*, 509 U.S. at 593-94). When it comes to evaluating non-scientific fields that are "technical or "specialized" in nature, these factors may be applied, but are not mandatory in every case. *United States v. Mallory*, 902 F.3d 584, 594 (6th Cir. 2018) (citing *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150-51 (1999)).

In general, "the rejection of expert testimony is the exception rather than the rule." 29 Charles Alan Wright & Victor Gold, Federal Practice and Procedure 192, (2d ed. 2016) Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

Nevertheless, while the qualification requirement under Rule 702 is a liberal one, courts will not accept a witness as an expert "simply because he claims to be." *Pride*, 218 F.3d at 577; *see also Kumho Tire Co.*, 526 U.S. at 157 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

B. Summary Judgment

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out an absence of evidence supporting the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Resolution Trust Corp. v. Myers*, 9 F.3d 1548 (6th Cir. 1993) (unpublished table opinion) (citing *Anderson*, 477 U.S. at 249).

However, the party opposing the summary judgment motion "must do more than simply show that there is some metaphysical doubt as to the material facts." *Amini v. Oberlin Coll.*, 440 F.3d 350, 357 (6th Cir. 2006) (quoting *Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 800 (6th Cir. 1994)) (quotation marks omitted). A mere "scintilla of evidence" in support of the non-moving party's position is insufficient. *Daniels v. Woodside*, 396 F.3d 730, 734–35 (6th Cir. 2005) (quoting *Anderson*, 477 U.S. at 252). Accordingly, the non-moving party "may not rest upon [his] mere allegations," but must instead present "specific facts showing that there is a genuine issue for trial." *Pack v. Damon Corp.*, 434 F.3d 810, 814 (6th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)) (quotation marks omitted). In sum, summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## III. Analysis

Defendants' *Daubert* challenge and motion for summary judgment were filed simultaneously. The Court will address the *Daubert* challenge first.

A. Defendants' motion to exclude the opinions of Eric Dyson (ECF No. 86).

Defendants moved to exclude Mr. Eric Dyson's report, related opinions, and testimony. Defendants argue (1) Dyson is unqualified to opine on loss and damages because he is not an economist and has no experience analyzing such losses; (2) his methodology is unreliable; (3) Dyson's recordkeeping opinion fails the standards of reliability and relevance; and (4) Dyson cannot rely on his experience as an investment consultant. (ECF No. 86 at PID 3779–80).

Here are the summaries of Dyson's two opinions for Plaintiffs:

a. The Plan fiduciaries failed to monitor, benchmark, and negotiate recordkeeping costs consistent with the standard of care which I have observed to be taken by other ERISA plan fiduciaries acting in the best interests of plan participants. Benchmarking appears to have been limited to the use of a proprietary data base provided by the Plan's advisor. Although an RFI for record keeping pricing was conducted in 2018 there was never a truly competitive bid for recordkeeping pricing and services such as a formal Request for Proposal (RFP). As a result of these failures by the Plan fiduciaries and because recordkeeping costs were paid by Plan participants, it is my opinion that this caused losses to the participants during the class period of over $1.4 million dollars.

b. The Plan fiduciaries failed to monitor the Plan's designated investment options consistent with the standard of care which I have observed to be taken by other ERISA plan fiduciaries acting in the best interests of plan participants. While the Plan fiduciaries did retain an investment advisor for the Plan, conducted regular investment committee meeting and documented proceedings with meeting minutes, they still failed to remove investments from the Plan which consistently underperformed benchmarks. As a result, several investment options which underperformed criteria outlined in the Plan's investment policy statement (IPS) and had poor performance metrics were retained in the Plan throughout the class period. The failure to remove these

underperforming funds was to the detriment of Plan participants resulting in losses to the participants which I estimate to be nearly $28 million since the beginning of the class period.

(ECF No. 80-2 at PID 1897).

1. Dyson is Qualified to Opine on Loss and Damages

Defendants argue that Dyson lacks the necessary knowledge, expertise, and qualifications to opine on loss and damages because he is not an economist or mathematician. Defendants assert that Dyson has no formal education regarding the economic analysis of mutual funds; he has written no literature on the matter; he cites no literature in his report; and he did not know whether his analysis complied with scientific economic principles. Defendants maintain Dyson's general experience as a retirement plan consultant does not fill the gap. In response, Plaintiffs argue that Dyson does have formal education and extensive experience managing and analyzing mutual funds as a consultant. The Court finds Dyson is qualified to opine on loss and damages.

In the Sixth Circuit, courts "take a liberal view of what 'knowledge, skill, experience, training, or education' is sufficient" to satisfy Rule 702. *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208–09 (6th Cir. 2015) (citing *Pride*, 218 F.3d at 577 and quoting Fed. R. Evid. 702). An expert need not be a specialist in every subject to which their testimony might relate. *Counts v. Gen. Motors, LLC*, 606 F. Supp. 3d 547, 568 (E.D. Mich. 2022). Experts are also not required to have "complete knowledge about the field in question." *Buren v. Crawford Cnty.*, No. 13-CV-14565, 2016 WL 5369597, at *2 (E.D. Mich. Sept. 26, 2016) (citing *Mannino v. Int'l Mfg. Co.*, 650 F.2d 846, 850 (6th Cir. 1981)). Instead, lack of experience in a specialized area within a field goes to the weight, not the admissibility, of expert testimony.

*Ross v. Am. Red Cross*, No. 2:09-CV-905, 2012 WL 1656995, at *4 (S.D. Ohio May 10, 2012), *aff'd*, 567 F. App'x 296 (6th Cir. 2014). "I think he has specialized knowledge that will assist the trier of fact in understanding the evidence, and any weaknesses in his background will go to the weight to be accorded to his opinion." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 333 (6th Cir. 2001) (quoting from and then affirming a district court).

Here, Dyson has a wealth of experience concerning the management of investment funds. He also has a bachelor's degree and is a certified financial planner with several other certifications. Plaintiffs cite *Seawell v. Brown*, No. C-1-08-614, 2010 WL 11561287, (S.D. Ohio Sep. 9, 2010) as an instructive analog. *Seawell* was also an ERISA case, and the court struck the expert's testimony. *Id.* at *7. The Court found that expert's general familiarity with mutual plans was insufficient to amount to expertise:

> Clarke [the expert] testified that he has no license to sell securities, he has never worked for a broker-dealer selling securities, he has never acted as a registered investment advisor or registered representative in the sale of securities, he has never served as an investment consultant or manager, he has never provided financial planning to any client for a fee, he has never conducted a suitability analysis for a customer in the sale of a security, he has no professional training as an accountant, and he has never prepared any financial statements for a corporation. While much of Clarke's career has been devoted to teaching at the university level, his description of the subjects he taught does not show that his teaching experience qualifies him as an expert in calculating damages sustained as a result of allegedly imprudent investment decisions. In fact, Clarke testified that he did not perform statistical analysis in this case; microeconomics, applications of computers and management have no applicability here; and he could not otherwise affirmatively testify that he used any of the subject matter he taught in formulating his expert opinion in this case.

*Id.* at *6. The *Seawell* expert lacked a college degree and was never registered as an investment advisor. *Seawell* is distinguishable because Dyson is educated and holds several applicable licenses.

Under the standard, Dyson is qualified to opine on loss and damages. Defendants do not attack Dyson's qualifications to opine on investment selection generally. The Court finds that calculations associated with investment selections—calculating projected growth or loss—is a necessary part of advising individuals on investment strategy. These kinds of routine calculations, which constitute a necessary and ancillary part of advising individuals on investing, are inherent in Dyson's experience. Considering the liberal standard, the Court finds that Dyson is qualified to make calculations ancillary to his wealth of experience. *Bradley*, 800 F.3d at 209 (finding abuse of discretion when a district court found an expert's range of expertise too narrow). To the extent that Defendants want to attack Dyson's qualifications, cross examination is available.

"Good qualifications in other words cannot save a flawed methodology." *Williams v. Syphan*, No. 22-3222, 2023 WL 1305084, at *5 (6th Cir. Jan. 31, 2023).

2.  Dyson's Methodology for Plan Performance and Challenged Investments

Defendants argue that Dyson's opinions are not the product of reliable principles and methods, are contradictory to the law, based on hindsight, and prepared solely for this litigation. In response, Plaintiffs argue that Dyson employed the alternative investment test, which is a reliable methodology.

An essential element of Plaintiffs' claims includes showing that the fiduciary Defendants engaged in an imprudent process of monitoring the challenged investments and

recordkeeping fees. *See Pfeil v. State St. Bank & Tr. Co.*, 806 F.3d 377, 384 (6th Cir. 2015). "The test for determining whether a fiduciary has satisfied his duty of prudence is whether the individual trustees, at the time they were engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Id.* at 384 (quoting *Hunter v. Caliber Sys., Inc.*, 220 F.3d 702, 723 (6th Cir. 2000) (quotation marks omitted)). This test is one of conduct, not of results, and a plaintiff must plausibly allege actions that were objectively unreasonable. *Ellis v. Fidelity Mgmt. Trust Co.*, 883 F.3d 1, 10 (1st Cir. 2018). "Although ERISA 'does not allow fiduciaries merely to offer a broad range of options and call it a day,' a showing of imprudence cannot "come down to simply pointing to a fund with better performance." *Forman v. TriHealth, Inc.*, 40 F.4th 443, 448–49 (6th Cir. 2022) (quoting *Smith v. CommonSpirit Health*, 37 F.4th at 1166 (6th Cir. 2022).

The alternative investment test is "recognized as a reliable means of calculating damages in ERISA cases that involve breaches of fiduciary duty for failures to prudently invest and manage an employee retirement plan." *Harris v. Koenig*, 815 F. Supp. 2d 6, 9 (D.D.C. 2011) (collecting cases). "Losses to a plan from breaches of the duty of prudence may be ascertained, with the help of expert analysis, by comparing the performance of the imprudent investments with the performance of a prudently invested portfolio." *Evans v. Akers*, 534 F.3d 65, 74 (1st Cir. 2008).

The Court finds that Dyson's methodology, the alternate investment test, is reliable when employed correctly. Dyson "summarize[d] investment choices which underperformed benchmarks, similar alternative investments that were available to the Plan and resulting

losses to participants when performance is compared to alternate funds." (ECF No. 80-2 at PID 1913). Dyson created a table comparing the Challenged Funds to his selected funds, and calculated losses stemming from the difference in their performance. Naturally, Dyson's selected funds outperformed the Plan's funds.

| Plan Investment Choice | Alternative Similar Investment Used for Loss Calculations | Losses to Plan |
|---|---|---|
| Hotchkis&Wiley Mid-Cap Value I (HWMIX) | Vanguard Mid Cap Index Admiral (VIMAX) | $ 5,810,911.20 |
| American Funds Europacific Growth R6 (RERGX) | Vanguard Institutional Growth Adm (VWILX) | $ 12,323,500.86 |
| Lazard Emerging Markets Equity Instl Returns (LZEMX) | Vanguard Emerging Mkts Stock Idx Adm (VEMAX) | $ 1,508,588.31 |
| Templeton Global Bond R6 (FBNRX) | Dodge&Cox Bond I (DODLX) | $ 6,645,334.29 |
| T. Rowe Price New Era I (TRNEX) | BNY Mellon Natural Resources (DLDRX) | $ 1,702,435.78 |
| | **Total Losses** | **$ 27,990,770.43** |

Dyson's report explained some of what motivated his selections:

> Selection of alternative investments for loss calculations were based on possible investment choices that would closely mirror an appropriate benchmark for each of the investment choices. As outlined in Section V.D above, an actively managed investment choice for a defined contribution plan should be expected to meet or exceed its passive equivalent. Otherwise, the investment is generally inappropriate for the plan from a fiduciary standpoint since it invariably has higher fees and lower returns compared to its passive equivalent. Since the benchmarks utilized by the Plan fiduciaries for comparison are not investible securities for the Plan, where possible an equivalent passive fund which generally mirrors the appropriate benchmark was used. If an equivalent fund which mirrors an appropriate passive benchmark was not available for a particular asset class, then emphasis was placed on investment choices with low fund expenses.

(ECF No. 80-2 at PID 1913). Earlier in his report, Dyson also remarked that the "many considerations in selecting an investment menu are the number of different asset classes, active versus passive management, the use of modern portfolio theory and risk adjusted returns, liquidity, risk tolerance, investment fees and time horizon among other considerations." (*Id.* at PID 1903). Dyson testified that he considered the time horizon in his analysis despite not writing on it or opining on it in his report. (ECF No. 80-8 at PID 2501). He did not opine on how the investments performed in the overall market cycle, and he did not consider how the asset class of the relevant funds impacted performance. (*Id.*).

Defendants take issue with the funds that Dyson selected. They argue that he did not explain why he selected them, and that the selected comparator funds provide for an "apples to oranges" comparison.

In *Smith*, the Sixth Circuit explained that actively and passively managed funds are materially different, and that comparing them does not show imprudence under ERISA. 37 F.4th at 1166 (citing *Davis v. Washington Univ. in St. Louis*, 960 F.3d 478, 484 (8th Cir. 2020)). *See also Meiners v. Wells Fargo & Co.*, 898 F.3d 820, 823 (8th Cir. 2018) ("The fact that one fund with a different investment strategy ultimately performed better does not establish anything about whether the [challenged funds] were an imprudent choice at the outset.").

Dyson employed an apples to oranges comparison for some funds. The Hotchkis & Wiley Mid Cap Value Fund, Lazard Emerging Markets Fund, Templeton Global Bond Fund, T. Rowe Price New Era Fund, and American Funds EuroPacific Growth Fund are all *actively* managed funds. Dyson's analysis is problematic because two of the Vanguard funds

(VIMAX and VEMAX) referenced above are *passively* managed, and Dyson used them to calculate losses. This is an apples to oranges comparison because whether a fund is actively managed or passively managed has a material impact on fees and performance. Actively managed funds are just that—actively managed by investment gurus to optimize gains, which also incur higher fees. *See Davis*, 960 F.3d at 484 (explaining the difference between passive and active funds). Passive funds are more hands off and track the performance of an index. *Id.* Actively managed funds are presumed to outperform their passive equivalents because otherwise the fees associated with active funds are not worth the expense. Considering *Smith*, the Court finds that the damages calculations for the Hotchkis & Wiley Mid Cap Value Fund and Lazard Emerging Markets Fund are unreliable, premised on the wrong comparator funds, and fail the *Daubert* analysis.

Next Defendants argue that Dyson's opinions are unreliable because it is premised on hindsight. They cite *Munro v. University of Southern California*, where a court found that an expert's analysis was premised on hindsight. No. 2:16-CV-06191-VAP-EX, 2022 WL 16955481, at \*4 (C.D. Cal. Nov. 1, 2022). But Dyson's opinions are premised on the idea that the Committee repeatedly received information regarding the Challenged Funds poor performance and decided not to remove the funds. (ECF No. 80-2 at PID 1912). And the opposite was true in *Munro*. 2022 WL 16955481, at \*3. ("Defendants did not have access to the funds' 2011-2016 performance data back in 2010 . . ."). *Munro* is not binding or persuasive to this matter.

3.  Dyson's Opinions Regarding Fiduciary Prudence and Procedure

Defendants want to exclude Dyson's opinions that the fiduciaries had a flawed process in selecting and monitoring the funds. In Defendants view, Dyson's opinion—that the fund was mismanaged because the poorly performing investments remained on the watchlist too long—is impermissible because it was based on his own experience only. In response, Plaintiffs argue that Mr. Dyson need not base his opinion on the best possible evidence or the most ideal scientific evidence in order for it to gain admissibility. "In [affirming the district court], we find the *Daubert* reliability factors unhelpful in the present case, which involves expert testimony derived largely from [the expert's] own practical experiences throughout forty years in the banking industry." *First Tennessee Bank Nat. Ass'n*, 268 F.3d at 335. Expert opinions can be based on the expert's "practical experiences." *Id.; see also Little Hocking Water Ass'n, Inc.*, 90 F. Supp. 3d at 757 (quoting *U.S. ex rel. Martin v. Life Care Centers of Am., Inc.*, No. 1:08-CV-251, 2014 WL 4816006, at *2-3 (E.D. Tenn. Sept. 29, 2014)). This argument is rejected.

Additionally, Defendants argue that Dyson's opinions boil down to personal disagreements with the decisions made by the Committee. Dyson's relevant opinion states, "Despite the Plan fiduciaries meeting regularly, conducting investment reviews and documenting their deliberations via meeting minutes, their decisions resulted in some investments retained in the Plan which failed to meet criteria of the IPS and underperformed over the class period." (ECF No. 80-2 at PID 1912). Defendants argue this is just a "personal disagreement" with the Committee's decision and is not an expert opinion. Defendants rely on *Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997).

The *Joiner* Court held that abuse of discretion is the proper standard by which to review a district court's decision to admit or exclude scientific evidence, *id.* at 146, but the case also concerned the applicability of certain studies used to form an expert's opinion. *Id.* The *Joiner* expert opined that it was "more likely than not that Mr. Joiner's lung cancer was causally linked to cigarette smoking and PCB exposure." *Id.* at 143. The problem was the expert's opinion relied on a series of studies concerning animals, like infant mice. *Id.* "The studies were so dissimilar to the facts presented in this litigation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them." *Id.* at 144–45. Another study—upon which the expert relied—did not suggest a link between cancer and PCBs at all. *Id.* at 145. The Court affirmed the district court for barring the studies and opinions because there was too great an analytical gap between the data and opinions proffered. Defendants read this case to mean that courts should not admit evidence that is connected to existing data only by the *ipse dixit* of the expert.

*Joiner* is not particularly helpful as Dyson does not rely on irrelevant studies. But perhaps a fair reading of *Joiner* is that an expert cannot say something is so without *some* basis. Here, that basis is Dyson's experience. Opining on whether smoking causes lung cancer, which is scientific in nature, is far more technical than opining on readily observable behavior like whether it was prudent to select a certain fund. And all of Dyson's relevant experience would suggest that he is qualified to opine on the selection process. Overall, Dyson's extensive relevant experience can serve as a basis to render his opinions regarding the overall prudence of the Committee.

Finally, Defendants complain that Dyson does not opine on when the Challenged funds became imprudent to retain. However, they cite no authority where such an argument served as grounds for exclusion. This argument is best left for cross examination.

4. Dyson's Opinions Regarding Reasonable Recordkeeping Fees

Dyson criticizes the fiduciaries because they did not conduct enough RFPs to secure reasonable fees. The Committee conducted RFPs in 2014 and 2021. The fiduciaries conducted a Request for Information ("RFI") in 2018, which resulted in an interim decrease in fees. In Dyson's view, this was insufficient to protect the Plaintiffs and amounted to a breach of the fiduciary duties owed to Plaintiffs.

Throughout the class period, the contractual recordkeeping cost with the Plan recordkeeper, Fidelity, was stated in terms of a flat cost per participant per year for each participant that had a balance in the Plan of greater than zero dollars. At the beginning of the class period, the annual per participant recordkeeping contractual rate was $62 per participant. On July 1, 2018, the rate was reduced to $53 per participant following the RFI. The current recordkeeping cost is $31 per participant and became effective on July 1, 2022 after the second RFP. The Department of Labor ("DOL") suggests that Plan managers conduct RFPs every three to five years.

Dyson opines that the recordkeeping fees were too expensive. He bases his opinion on two figures. First, Dyson relies on a $21 per participant fee. The $21 figure comes from a 2019 discovery stipulation ("*Moitoso* stipulation") filed in another case where Fidelity was involved. *Moitoso v. FMR LLC*, 451 F. Supp. 3d 189, 214 (D. Mass. 2020). ("The parties have stipulated that if Fidelity were a third party negotiating this fee structure at arms-length,

the value of services would range from $14-$21 per person per year over the class period, and that the recordkeeping services provided by Fidelity to this Plan are not more valuable than those received by other plans of over $1,000,000,000 in assets where Fidelity is the recordkeeper."). In *Moitoso*, Fidelity's own plan was at issue.

As above, Defendants argue that Dyson's opinions do not meet *Daubert's* standards and must be excluded because they are not based on any reliable methodology and are contrary to the law and his experience. Defendants argue that Dyson's use of the *Moitoso* stipulation is a flawed methodology because it is not relevant to this litigation and boils down to a legal conclusion. In response, Plaintiffs counter that the *Moitoso* stipulation shows that similarly situated Plaintiffs could negotiate $21 fees with Fidelity and that another (more timely) RFP would lower fees. Plaintiffs also counter that the use of this figure was not "methodology" but rather a reliable data point to reference.

The Court will reject the use of the *Moitoso* stipulation for calculating loss because it is unreliable. First, Fidelity took that position in the *Moitoso* litigation regarding the recordkeeping services it provided for *its own plans*. Further, Dyson even acknowledges that the "*Moitoso* case was much larger than the Amway Plan in terms of both assets and participants." (ECF No. 80-2 at PID 1909). The litigants in the *Moitoso* action and this action are not similarly situated. Other courts have already rejected other experts' attempts to rely on the same figure for similar reasons. *See e.g., Wehner v. Genentech, Inc.*, No. 20-CV-06894-WHO, 2021 WL 507599, at *6 (N.D. Cal. Feb. 9, 2021); *Williams v. Centene Corp.*, No. 4:22-CV-00216-SEP, 2023 WL 2755544, at *5 (E.D. Mo. Mar. 31, 2023);

*Johnson v. PNC Fin. Servs. Grp., Inc.*, No. 2:20-CV-01493-CCW, 2021 WL 3417843, at *4 (W.D. Pa. Aug. 3, 2021).[1]

Second, Dyson relies on an alternative benchmark of a $31 per participant fee, which stems from an amalgamation of several sources: (1) the *Moitoso* stipulation, (2) the DiMeo Schenieder presentation, and (3) the Plan's new $31 fee stemming from the 2021 RFP. (ECF No. 80-2 at PID 1909). Because the *Moitoso* stipulation serves as a basis for his $31 benchmark, the Court rejects it as well. Dyson's loss calculations for the recordkeeping claims are based on unreliable figures and data. The Court will not consider them.

In sum, the Court denies in part and grants in part Defendants' motion to exclude Dyson and his opinions. He is generally qualified, and his opinions are sustained by his experience. Aside from his use of the two passively managed funds and the *Moitoso* stipulation, his methodology and metrics are reliable. Said another way, Dyson's damages calculations for the entirety of the recordkeeping claims and his damages calculations stemming from The Hotchkis & Wiley Mid Cap Value Fund and Lazard Emerging Markets Fund will be barred.

## B. Defendants' Motion for Summary Judgment

Defendants moved for summary judgment on Plaintiffs' underperformance claim and recordkeeping claim.

### 1. Underperformance Claim (Count I)

---

[1] Dyson's report indicates that he may have anticipated that the Court would reject the $21 figure: "If a decision is rendered that this approach is not reasonable, then an alternate reasonable recordkeeping cost of $31 per participant should be considered." (ECF No. 80-2 at PID 1910). Even so, he also used the *Moitoso* stipulation as a basis for his alternative $31 benchmark.

The premise of Count I is that Defendants breached their duty of prudence under ERISA by retaining five Challenged Funds that underperformed over various times in the class period. The Challenged Funds are The Hotchkis & Wiley Mid Cap Value Fund, Lazard Emerging Markets Fund, Templeton Global Bond Fund, T. Rowe Price New Era Fund, and American Funds EuroPacific Growth Fund.

An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would employ. *Tibble v. Edison Int'l*, 575 U.S. 523, 528 (2015) (quoting § 1104(a)(1)). "An ERISA fiduciary's duty is 'derived from the common law of trusts.'" *Id.* (quoting *Cent. States, Se. & Sw. Areas Pension Fund v. Cent. Transp., Inc.*, 472 U.S. 559, 570 (1985)). "Under trust law, a trustee has a continuing duty to monitor trust investments and remove imprudent ones"; the same applies to a fund manager under ERISA standards. *Tibble*, 575 U.S. at 529 ("A plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones.").

"In assessing the prudence of a plan administrator's decision-making process, context often is destiny." *Forman v. TriHealth, Inc.*, 40 F.4th 443, 448 (6th Cir. 2022). "The test for determining whether a fiduciary has satisfied [their] duty of prudence is whether the fiduciary, at the time he engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Cassell v. Vanderbilt Univ.*, 285 F. Supp. 3d 1056, 1061 (M.D. Tenn. 2018) (citing *Pfeil*, 806 F.3d at 384); *see also Donovan v. Cunningham*, 716 F.2d 1455, 1467 (5th Cir. 1983) ("This is not a search for subjective good faith—a pure heart and an empty head are not enough.").

"In *Tibble*, this Court explained that, even in a defined-contribution plan where participants choose their investments, plan fiduciaries are required to conduct their own independent evaluation to determine which investments may be prudently included in the plan's menu of options." *Hughes v. Nw. Univ.*, 595 U.S. 170, 176 (2022). "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time, they breach their duty." *Id.* The Sixth Circuit developed what is required to plead imprudence:

> We accept that pointing to an alternative course of action, say another fund the plan might have invested in, will often be necessary to show a fund acted imprudently (and to prove damages). But that factual allegation is not by itself sufficient. In addition, these claims require evidence that an investment was imprudent from the moment the administrator selected it, that the investment became imprudent over time, or that the investment was otherwise clearly unsuitable for the goals of the fund based on ongoing performance.

*Smith*, 37 F.4th at 1166. Ultimately, a prudent fund manager is not dilatory and makes informed decisions. Plaintiffs claim will hinge on whether it was imprudent for the Committee to retain the challenged funds.

Defendants assert that Plaintiffs are unable to prove a breach of the standard of care in monitoring the challenged investments. Additionally, Defendants maintain that Plaintiffs lack sufficient evidence to prove loss and causation, which would entitle them to summary judgment. The Court rejects the latter argument from the outset because some of Dyson's loss calculations survived Defendants' *Daubert* challenge.

First, Defendants state that everyone agrees that the Committee "engaged in a robust investment review process." Defendants' argument is that the Committee could not have been imprudent because the Committee met regularly, conducted investment reviews, and

documented their deliberations via meeting minutes. Defendants then describe the Committee's monitoring process and maintain the process itself precludes the Court from finding any evidence of imprudent management.

But Plaintiffs are quick to point out that Dyson opined that the Committee's decisions "resulted in some investments retained in the Plan which failed to meet criteria of the IPS and underperformed over the class period." (ECF No 80-2 at PID at 1912). Dyson also argued that the Committee should have considered other cheaper, passive plans in light of the failing challenged funds, which were actively managed and more expensive. On this point, Defendants fail to show an absence of evidence to support Plaintiffs' claims. "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating 'an absence of evidence to support the nonmoving party' s case.'" *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003) (quoting *Celotex Corp.*, 477 U.S. a 325). Defendants' argument is rejected.

Imprudence boils down to reasonableness, which is inherently factual. For example, a snapshot of Dyson's testimony is helpful to illustrate that evaluating Dyson's opinions may well come down to a credibility assessment by the fact finder.

> THE WITNESS: I am not suggesting that the committee did not -- let me -- let me make sure I get my statement correct. I'm not offering the opinion that they did not review.
> BY MS. CHOPIN: Q. Okay. So you would agree with me that the committee conducted regular investment reviews every quarter, if not more often?
> MR. WELLS: Objection to form.
> You can answer.
> THE WITNESS: I -- I'm not sure they did for every quarter because there are some meeting minutes that are very brief. But in general, they met on a regular basis.
> BY MS. CHOPIN:

Q. Okay. And do you have a specific committee meeting in mind that was very brief?

A. I don't. And -- and just to clarify, if I said "the meeting," what I meant was the -- the minutes --

Q. Okay.

A. -- are very sparse on -- on occasion.

Q. Okay. And --

A. And to answer your question: No, I don't recall which ones specifically they are.

Q. Okay. So you don't cite to any of those minutes in the report?

A. No.

(ECF No. 80-8 at PID 2489).

Q. And did you consider all the modern portfolio statistics that were considered by the committee in their quarterly meetings?

A. Yes.

Q. So they -- they did -- you agree that they did look at those types of statistics?

A. They were in the reports. I don't know to what degree they were discussed at each meeting.

(*Id.* at 2507).

Judge Edmunds in the Eastern District of Michigan denied summary judgment under

similar circumstances:

The existence of a deliberative process does not alone resolve the issue. "While the absence of a deliberative process may be enough to demonstrate imprudence, the presence of a deliberative process does not, . . . suffice in every case to demonstrate prudence." *Sacerdote v. New York University*, 9 F.4th 95, 111 (2d Cir. 2021). "Deliberative processes can vary in quality or can be followed in bad faith. In assessing whether a fiduciary fulfilled her duty of prudence, we ask 'whether a fiduciary employed the *appropriate* methods to investigate and determine the merits of a particular investment,' not merely whether there were any methods whatsoever." *Id.*

*Davis v. Magna Int'l. of Am., Inc.*, No. 20-11060, 2023 WL 3821807, at *4 (E.D. Mich. June

5, 2023). Because Dyson opines that the Committee's methods were deficient, summary

judgment is not appropriate on the underperformance claim. *Feinberg v. T. Rowe Price*

*Group, Inc.*, 2021 WL 488631, at *8 (D. Md. Feb. 10, 2021) ("[T]hough the evidence shows the Trustees engaged in a legitimate oversight process and that the Plan's assets tripled under their stewardship, it would be premature to find that their conduct was loyal and prudent in all instances as a matter of law."); *see also McCool v. AHS Mgmt. Co., Inc.*, No. 3:19-CV-01158, 2023 WL 2752400, at *3 (M.D. Tenn. Mar. 31, 2023) (explaining that evidence of quarterly meetings did not equal an "absence of evidence to support Plaintiffs' claims, as required to shift the burden to Plaintiffs as the nonmoving party").

Defendants failed to establish no material facts are in dispute, and the burden on summary judgment cannot shift to Plaintiffs.

2. Recordkeeping Claim (Count II)

As contemplated above, the Court excluded Dyson's damages calculations relating to Plaintiffs' recordkeeping claim. Without evidence of loss, Plaintiffs' claims fail. Because this evidence would not be admissible at trial, it will not be considered on the summary judgment motions. *Cunningham v. Cornell Univ.*, No. 16-CV-6525 (PKC), 2019 WL 4735876, at *6-7 (S.D.N.Y. Sept. 27, 2019), *aff'd*, 86 F.4th 961 (2d Cir. 2023) (collecting cases where summary judgment was granted in defendants' favor because loss is a necessary element of an ERISA claim, and plaintiffs had no evidence of loss).

## IV. Conclusion

Defendants moved to exclude Plaintiffs' ERISA expert and his opinions. (ECF No. 86). That motion is granted as it relates to two of his loss calculations for Plaintiffs' underperformance claim and all of his loss calculations related to Plaintiffs' recordkeeping

claim. The Court will grant Defendants' motion for summary judgment on Plaintiffs' recordkeeping claim and deny it for Plaintiffs' underperformance claim.

**IT IS HEREBY ORDERED** that Defendants' motion to exclude Plaintiffs' expert (ECF No. 86) is **GRANTED in part** and **DENIED in part.**

**IT IS FURTHER ORDERED** that Defendants' motions for summary judgment (ECF No. 80) are **GRANTED in part** and **DENIED in part.**

**IT IS SO ORDERED.**

Date:  April 16, 2024                                   /s/ Paul L. Maloney
                                                        Paul L. Maloney
                                                        United States District Judge